UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| CARLOS ROMAN, individually and on behalf of all others similarly situated, | |
| Plaintiff, | No. 23 CV 15146 |
| v. | Judge Manish S. Shah |
| TRITON LOGISTICS, INC. and ANDREW VOVERIS, individually, | |
| Defendants. | |

MEMORANDUM OPINION AND ORDER

Plaintiff Carlos Roman was a truck driver for defendant Triton Logistics, Inc. He alleges that Triton misclassified its drivers as independent contractors, withheld drivers' pay, and failed to reimburse work expenses in violation of the Illinois Wage and Payment Collection Act. He moves to certify a class of all other Triton drivers in Illinois who were classified as independent contractors.

I.    Facts

Plaintiff Carlos Roman was a truck driver for defendant Triton Logistics, Inc. from May 2023 to September 2023. [29-5] at 6.[1] Triton, a freight transportation

---

[1] Bracketed numbers refer to entries on the district court docket. Referenced page numbers are taken from the CM/ECF header placed at the top of filings, except in the case of citations to transcripts, which use the transcript's original page number. When a document has numbered paragraphs, I cite to the paragraph, for example [20] ¶ 1. The seal on [30-1], [30-2], and [30-3] is lifted. Filings that affect the disposition of litigation are presumptively open to public view unless a statute, rule, or privilege justifies confidentiality. *City of Greenville, Ill. v. Syngenta Crop Prot., LLC*, 764 F.3d 695, 697 (7th Cir. 2014). The party seeking confidentiality must show good cause to overcome the strong presumption toward public disclosure. *Heraeus Kulzer, GmbH v. Biomet, Inc.*, 881 F.3d 550, 566 (7th Cir. 2018). The

company, maintained two yards, one in Illinois and another in Virginia. [20] ¶¶ 1, 15–16; [29-1] at 14:23–15:10. Drivers primarily transported freight to and from these yards as directed by Triton's load planners and dispatchers. [29-1] at 14:23–15:10.

Roman was hired as a "company driver," which he understood to mean that he was an employee of Triton, rather than an "owner operator," who owns or leases a truck used to transport freight. [29-4] at 104:6–105:11, 148:11–17. Triton classified Roman as an independent contractor. [29-5] at 6. During the applicable period, Triton classified its 538 company drivers, with only three exceptions, as independent contractors. [29-5] at 7.

Company drivers were subject to Triton's uniform policies and practices. Triton set company drivers' rates of pay and manner of compensation, which were not subject to negotiation. [30-2] at 1–4. Triton paid drivers a set rate per mile on a weekly basis, from which Triton took regular, mandatory deductions. *Id.* Triton withheld $200 per week from drivers' earned wages for purposes of an "escrow account," over which Triton retained exclusive control. [30-2] at 1, 4 (Driver's Compensation Policy); [30-3] (Triton's weekly settlements). The purpose of the escrow fund was "to make sure that drivers always ha[d] sufficient funds to reimburse the company for incurred debt." [30-2] at 1. The escrow funds would be returned to drivers 45 days after

---

parties made little effort to justify the claim of secrecy—the parties assert that the documents were marked as confidential in discovery and "contain proprietary information." [31] at 2. Confidentiality for purposes of discovery is not a reason to conceal information relied upon in judicial decisionmaking. *Baxter Int'l, Inc. v. Abbott Lab'ys*, 297 F.3d 544, 545 (7th Cir. 2002). The parties' assertion of "proprietary information" does not point to a protectable trade secret or other reason to keep the exhibits from public inspection. *See* [31]. Such perfunctory demands for secrecy may be summarily rejected. *Id.* at 546–48 (a litigant must do more than just identify a kind of information and demand secrecy).

termination. *Id.* Triton also deducted $40 per week from drivers' pay for occupational accident insurance. *Id.* at 4. Triton unilaterally increased this insurance deduction from $40 to $65 in September 2023 without drivers' written authorization. [29-7].

Triton's operations and safety personnel directed, supervised, and disciplined drivers to ensure compliance with Triton's policies, which were set out in documents that Triton gave to drivers during orientation. *See, e.g.*, [30-2] (Driver's Compensation Policy); [29-8] (Rules of Conduct for All Drivers); [29-9] (General Policies). These policies prohibited drivers from using their "company vehicle and equipment for any private or non-company purposes" without "specific authorization from [their] supervisor," [30-2] at 2; banned them from "departing from assigned routes to attend to personal matters," *id.*; required drivers to limit their home time to no more than three days every two weeks, unless the driver had accumulated additional time off, *id.*; imposed monetary penalties on drivers for alleged policy infractions, [29-9] at 1, 9; and threatened termination if drivers failed to adhere to Triton's instructions and policies, which included "[e]xcessive absence, unexcused absence, or job abandonment," and "excessive tardiness," *id.* at 1.

Triton's drivers did not book their own loads, instead relying on Triton's dispatcher to find loads for them. [29-1] at 12:19–13:7, 84:9–22. Dispatchers booked loads, communicated with drivers, and dispatched them. [29-1] at 12:19–13:7, 22:22–23:2. Triton controlled drivers' schedules through load assignments because "getting deliveries delivered on time need[ed] to correspond with drivers' hours of service availability." [29-1] at 75:23–76:3. Triton monitored drivers' on-time status and

3

hours-of service availability, and coordinated with Triton's local dispatchers and load planners. [29-1] at 24:5–14, 50:15–19, 75:14–76:3, 86:22–87:9. Triton awarded a weekly bonus to the top five dispatchers, based on the weekly gross revenue generated and miles driven by the drivers. [29-1] at 23:6–27:6. Dispatchers were also evaluated based on driver retention. [29-1] at 26:12–14.

Dispatchers tracked drivers' movements to ensure that they headed to the correct location. [29-1] at 12:19–23, 22:22–23:2. The tracking software allowed dispatchers to see the location and speed of each driver's truck, as well as maintenance metrics. *Id.* at 46:4–11. The software alerted dispatchers of "excessive braking," *id.* at 52:3–9; and generated a "safety score" based on "high/severe amounts of speeding," [29-10] (Driver Bonus Program). Triton disciplined drivers for excessively driving miles out of their assigned routes and required drivers to fuel only at selected locations along their route. [29-1] at 89:4–15; [29-9] at 2. Drivers were required to submit their trip paperwork, including bills of lading, to Triton. [29-9] at 5, 7; [30-2] at 3.

Roman left Triton in September 2023. [29-4] at 131:11–14. Triton returned $2,000 held in escrow in November 2023 per Triton's policy of holding escrow funds for 45 days after separation. [29-4] at 134:21–135:8; [30-2] at 1.

Roman brought this case alleging that Triton improperly classified him and other drivers as independent contractors, and that Triton improperly withheld wages and failed to reimburse expenses. [1].

4

## II. Analysis

When seeking class certification under Federal Rule of Civil Procedure 23, the moving party bears the burden of demonstrating that certification is proper by a preponderance of the evidence. *Howard v. Cook Cnty. Sheriff's Off.*, 989 F.3d 587, 597 (7th Cir. 2021). Class-certification proceedings are not a "dress rehearsal for the trial on the merits," so I only evaluate evidence to decide whether certification is appropriate. *Messner v. Northshore Univ. HealthSystem*, 669 F.3d 802, 811 (7th Cir. 2012).

Under Rule 23(a), a plaintiff must satisfy four prerequisites: (1) numerosity; (2) commonality; (3) typicality; and (4) adequate representation. Fed. R. Civ. P. 23(a). After meeting this threshold, the plaintiff must demonstrate "through evidentiary proof" that the putative class action falls under one of the three prongs of Rule 23(b). *Comcast Corp. v. Behrend*, 569 U.S. 27, 33 (2013); Fed. R. Civ. P. 23(b). Roman argues that he satisfies Rule 23(b)(3), [29] at 7, which requires that "questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). In addition to Rule 23's explicit requirements, courts "have long recognized an implicit requirement . . . that a class must be defined clearly and that membership be defined by objective criteria." *Mullins v. Direct Digital, LLC*, 795 F.3d 654, 657 (7th Cir. 2015).

### A.    Class Definition and Numerosity

A class is "defined clearly" when it is precise, defined by objective criteria, and not defined by success on the merits. *Id.* Roman proposes a class of:

> [A]ll persons who have performed work in Illinois for Triton as company drivers while being classified as independent contractors since October 19, 2013.

[29] at 3. Company drivers who have worked for Triton as independent contractors in Illinois are identifiable using objective criteria. *See* [29-5] at 7 (identifying 535 drivers were engaged as independent contractors in the prior 10 years). The class is readily ascertainable.

The proposed class must also be too numerous for practicable joinder. Fed. R. Civ. P. 23(a)(1). "A class can be certified without determination of its size, so long as it's reasonable to believe it large enough to make joinder impracticable and thus justify a class action suit." *Orr v. Shicker*, 953 F.3d 490, 497–98 (7th Cir. 2020). The proposed class here is approximately 535 individuals.[2] [29-5] at 7. Numerosity is satisfied. *See Orr*, 953 F.3d at 498 ("While there is no magic number that applies to every case, a forty-member class is often regarded as sufficient to meet the numerosity requirement.").

---

[2] This number is taken from Triton's response to Roman's interrogatory asking Triton to "identify all individuals who have served as drivers for Defendants at any time since October 1, 2013, and for each individual include the hire date, termination date (if applicable), reason for termination (if applicable), whether the driver was an employee, 'independent contractor,' or 'owner operator.'" [29-5] at 5–7. While the interrogatory did not ask for drivers who worked in Illinois, Triton does not contest that this number matches the class definition or that numerosity is satisfied. *See* [38].

### B. Commonality and Predominance

Class certification is only appropriate if "there are questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(2). "[E]ven a single common question will do" to fulfill Rule 23's commonality requirement. *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 359 (2011) (quotations and citation omitted). "The key to commonality is 'not the raising of common questions . . . but, rather, the capacity of a class-wide proceeding to generate common answers apt to drive the resolution of the litigation.'" *Orr*, 953 F.3d at 498–99 (quoting *Wal-Mart*, 564 U.S. at 350). "Dissimilarities within the proposed class are what have the potential to impede the generation of common answers." *Id.*

For certification under Rule 23(b)(3), these common questions must predominate over individual questions that may arise in the case. Fed. R. Civ. P. 23(b)(3). The predominance inquiry focuses on whether a proposed class is "sufficiently cohesive to warrant adjudication by representation." *Gorss Motels, Inc. v. Brigadoon Fitness, Inc.*, 29 F.4th 839, 843 (7th Cir. 2022) (quoting *Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442, 453 (2016)). Scrutiny should be given to "the relation between common and individual questions in a case." *Tyson Foods*, 577 U.S. at 453. In other words, evaluating predominance "requires more than a tally of common questions; the district court must consider their relative importance." *Eddlemon v. Bradley Univ.*, 65 F.4th 335, 339 (7th Cir. 2023).

Roman argues that Triton engaged in a standard practice of misclassifying its company drivers as independent contractors and maintained a uniform compensation policy of unlawful standardized deductions and withholdings. [29] at 8. The Illinois

7

Wage and Payment Collection Act requires that "[a]ll wages earned by any employee during a weekly pay period shall be paid not later than 7 days after the end of the weekly pay period in which the wages were earned." 820 ILCS 115/4; *see also Costello v. BeavEx, Inc.*, 810 F.3d 1045, 1050 (7th Cir. 2016) (the Act provides "employees with a cause of action for the timely and complete payment of earned wages or final compensation."). The Act also prohibits deductions by employers from wages or final compensation unless the deductions are "(1) required by law; (2) to the benefit of the employee . . . [or] (4) made with the express written consent of the employee, given freely at the time the deduction is made." 820 ILCS 115/9.

Roman argues that there are three legal questions underlying his claims that are common to all putative class members: whether Triton misclassified drivers, whether Triton failed to pay earned wages on a timely basis, and whether Triton's deductions were lawful. [29] at 10–11. Triton argues that these questions cannot be determined by common evidence and will not predominate over individualized questions. [38] at 11–16.

### 1.    *Misclassification*

The threshold question for Roman's claims is whether he was an independent contractor or an employee, as the Act only applies to employees. It does not apply to anyone:

> (1) who has been and will continue to be free from control and direction over the performance of his work, both under his contract of service with his employer and in fact; and

> (2) who performs work which is either outside the usual course of business or is performed outside all of the places of business of the employer . . . ; and

8

(3) who is in an independently established trade, occupation, profession
or business.

820 ILCS 115/2. "The test is conjunctive, meaning that if an employer cannot satisfy
each of the prongs, then the individual must be classified as an employee for purposes
of the IWPCA." *Costello*, 810 F.3d at 1050. The burden of proof lies with the employer
to show that a worker is an independent contractor. *AFM Messenger Serv. v. Dep't of
Emp. Sec.*, 198 Ill.2d 380, 397–98 (2001).

Triton argues that Roman sought to be classified as an independent contractor
and never had the intention to be an employee. [38] at 9–10, 12. But that doesn't
undermine the commonality of the classification question, because Roman's
acceptance of Triton's classification is not a concern under the Act. It is "well
established that plaintiff's status under the Act is not controlled by how the parties
referred to themselves in their agreement." *Johnson v. Diakon Logistics, Inc.*, 44
F.4th 1048, 1052 (7th Cir. 2022), *reh'g denied*, No. 21-2886, 2022 WL 4290757 (7th
Cir. Sept. 16, 2022)). When determining whether an employer had "control and
direction over the performance" of a driver's work, a court looks primarily to the
employer's conduct, rather than the conduct of an individual employee. *See* 56 Ill.
Admin. Code § 300.460(a)(1) ("'Control' means the existence of general control or right
to general control, even though the details of work are left to an individual's
judgment.").

Roman argues that Triton's right to control and direct drivers' performance
will be determined from common evidence on a class-wide basis because all drivers
were subject to Triton's standardized course of conduct. [29] at 11–13. Roman

presents evidence that all drivers were governed by the same agreement. *See* [30-2] (Driver's Compensation Policy). Drivers were also subject to the same policies and procedures given to them during orientation. *See, e.g., id.*; [29-8] (Rules of Conduct for All Drivers); [29-9] (General Policies). Triton's operations and safety personnel directed, supervised, and disciplined drivers to ensure compliance with Triton's policies. *See id.* This is common evidence that can determine whether drivers were free from control and direction.

Triton can meet its burden as to the second element by either proving that drivers performed work "outside the usual course of business" or by proving that drivers performed work "outside of all the places of business of the employer." *See* 820 ILCS 115/2. This inquiry "only requires common evidence about [Triton's] business model, which is applicable to all class members." *See Costello*, 810 F.3d at 1059. The proposed class is exclusively drivers who had the same job duties under Triton's business model. The usual place of business was also the same among drivers. Drivers may have driven different routes, but freight was hauled from Triton's Illinois yard to Triton's other yard and specific customers' locations. *See Prokhorov v. IIK Transp., Inc.*, No. 20 CV 6807, 2023 WL 2711599, at *5 (N.D. Ill. Mar. 30, 2023) ("Whether those places [we]re part of or outside [defendant's] place of business is a merits question.").

As for the third prong,[3] an independently established business is "capable of operation without hindrance from any other individual." *AFM Messenger*, 198 Ill.2d at 400. It must enjoy a "degree of economic independence such that the enterprise could survive any relationship with the particular person contracting for services." *Id.* at 401. The truck drivers were subject to the same business model. Whether they could survive independent of Triton can be adjudicated through common evidence. *See, e.g., Prokhorov*, 2023 WL 2711599, at *5. Roman's misclassification claim presents common questions that will be resolved based on common evidence.

Such common questions must predominate over any questions affecting only individual members. Fed. R. Civ. P. 23(b)(3). "[A] common question predominates over individual claims if 'a failure of proof on the [common question] would end the case' and the whole class 'will prevail or fail in unison.'" *Bell v. PNC Bank, Nat. Ass'n*, 800 F.3d 360, 378 (7th Cir. 2015) (quoting *Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*, 568 U.S. 455, 460 (2013)). "In no event will the individual circumstances of particular class members bear on the inquiry" of whether drivers were misclassified. *See Amgen,* 568 U.S. at 460 ("[A] failure of proof on the issue of materiality would end the case . . . As to materiality, therefore, the class is entirely cohesive: It will prevail or fail in unison."). Further, the claims of every class member will rise or fall on the resolution of that question. If the drivers were employees, the Act applies to them, and Triton's withholding and deduction policies may have been illegal. If the drivers

---

[3] Roman does not move to certify the misclassification claim with respect to the third prong of the test, but states that it is also amenable to class treatment. [29] at 13 n.4.

were independent contractors, their claims fail. Whether drivers were misclassified is a common question that will predominate over individual issues. *See Costello*, 810 F.3d at 1060.

### 2. Withholdings and Deductions

Similarly, the legality of Triton's escrow withholding and insurance deduction can be adjudicated through common evidence and will predominate over individual issues. The Act requires that "[a]ll wages earned by any employee during a weekly pay period shall be paid not later than 7 days after the end of the weekly pay period in which the wages were earned." 820 ILCS 115/4. Employers must also "reimburse an employee for all necessary expenditures or losses incurred by the employee within the employee's scope of employment and directly related to services performed for the employer." 820 ILCS 115/9.5. A "necessary expenditure" is one that is "required of the employee in the discharge of employment duties" and "that inure[s] to the primary benefit of the employer." 820 ILCS 115/9.5.

Roman seeks to recover for Triton's failure to timely pay drivers their full wages by withholding $200 of drivers' earnings in escrow per week and for Triton's deduction policies requiring drivers pay for occupational accident insurance. Triton argues that drivers consented to these withholdings and deductions, thus determining whether these deductions violated the Act would require individual adjudication of every driver's agreement. [38] at 15–16.

Even when deductions are specified in a written agreement, such deductions are limited by the Act. *Johnson*, 44 F.4th at 1052 ("[I]t is also well established that plaintiff's status under the [Act] is not controlled by how the parties referred to

12

themselves in their agreement."). Deductions must be with "the express written consent of the employee, given freely at the time the deduction is made." 820 ILCS 115/9. Written consent for ongoing deductions is "given freely" only if the "written agreement provides for [the] defined duration of time [that deductions will occur,] and provides for the same amount of deduction each pay period . . . . No agreements for a defined duration of time [may] last longer than six months." 56 Ill. Admin. Code § 300.720(b) (2023); *see also Andrews v. Kowa Printing Corp.*, 217 Ill.2d 101, 116 (2005) (explaining that IDOL regulations are "an informed source for guidance when seeking to ascertain the legislature's intention when the [IWPCA] was enacted"). The question of whether Triton's policies satisfied the Act's requirements for consent to be "given freely" looks to the policies themselves—it is a common question that can be answered looking to common evidence.[4] There is no need to look at individual drivers' behavior in this analysis. Whether an employer can deduct or withhold money from an employee's pay, is determined by the statute and not any contract.

---

[4] The amended version of § 300.720(b) became effective March 2023 and likely does not apply retroactively. *See Perry v. Dep't of Fin. & Prof. Reg.*, 2018 IL 122349, ¶¶ 42–44 (the absence of clear legislative intent creates a presumption against retroactive application of statutes). The prior version of § 300.720(b) also defined "freely given consent" based on the written agreement itself:

> When a deduction is to continue over a period of time and the written agreement provides for that period of time, provides for the same amount of deduction each period and allows for voluntary withdrawal for the deduction, the agreement shall be considered to be given freely at the time the deduction is made.

56 Ill. Admin. Code § 300.720(b) (2014). Under either version, whether drivers freely consented to deductions will be determined by common evidence—the driver's compensation policy. *See Piquion v. Amerifreight Sys. LLC*, No. 22 C 5690, 2023 WL 8113379, at *19–20 (N.D. Ill. Nov. 22, 2023).

*See Byrne v. Hayes Beer Distrib. Co.*, 2018 IL App (1st) 172612, ¶ 32; *cf. Johnson*, 44 F.4th at 1052 ("If the critical test for determining whether plaintiffs count as employees for purposes of the Act comes from the statute rather than a contract, then the Service Agreement is irrelevant, no matter what it says.").

Because drivers were all subject to the same withholding policy, the practice is either lawful or unlawful as to all company drivers. It will be resolved looking at common evidence, such as the policy, applicable statute, and regulations. *See, e.g.,* [30-2] at 1 (Purpose of escrow fund "to make sure that drivers always have sufficient funds to reimburse the company for incurred debt"); [29-1] at 103:9–21.

Roman also argues that the question of whether Triton improperly deducted insurance costs from drivers' wages is amenable to class resolution. Employers are required to "reimburse an employee for all necessary expenditures or losses incurred by the employee within the employee's scope of employment and directly related to services performed for the employer." 820 ILCS 115/9.5. A "necessary expenditure" is one that is "required of the employee in the discharge of employment duties" and "that inure[s] to the primary benefit of the employer." 820 ILCS 115/9.5. Because drivers had the same duties, whether the insurance deduction was a necessary expenditure will be answered looking to common evidence—the terms of the occupational accident insurance policy covering Triton's drivers, Illinois law concerning employer's obligations to procure workers compensation for employees, and Triton's own descriptions of the deduction's purpose.

14

According to Triton, determining the deduction claim will require individualized inquiries into whether drivers properly submitted requests for reimbursement and whether Triton adequately paid each request defeating predominance. [38] at 15. Triton misunderstands Roman's claims and the Act. Roman's claims are not premised on having sought reimbursement while he was employed by Triton and Triton declining to reimburse him. Instead, he seeks reimbursement for occupational accident premiums and escrow amounts that Triton required all drivers to incur in the form of weekly settlement deductions. *See* [30-2] at 1. Roman argues that these deductions violated the Act because they were "necessary expenditures or losses incurred by [drivers] within [their] scope of employment and directly related to services performed for [Triton]." 820 ILCS 115/9.5. An "employee is not entitled to reimbursement . . . if [i] the employer has an established written expense reimbursement policy and (ii) the employee failed to comply with the written expense reimbursement policy." 820 ILCS 115/9.5(b). The escrow withholding and insurance deduction were not reimbursable under Triton's policy. [30-2] at 1. Whether Roman or other drivers requested reimbursement for the insurance or escrow withholding is irrelevant to Roman's theory of recovery.[5]

The class claims will fail or prevail in unison. Roman has satisfied Rule 23's commonality and predominance requirements as to his withholding and deduction claims.

---

[5] Triton did have a reimbursement policy for other expenses. [30-2] at 1. To the extent the parties dispute whether this provision covered the escrow withholding and insurance deduction, resolving that dispute would look to common evidence.

## C.     Typicality

"[T]he claims or defenses of the representative parties [must be] typical of the claims or defenses of the class." Fed. R. Civ. P. 23(a)(3). A representative's claims must "arise[] from the same event or practice or course of conduct that gives rise to the claims of other class members and . . . [be] based on the same legal theory. *Muro v. Target Corp.*, 580 F.3d 485, 492 (7th Cir. 2009). "The presence of even an arguable defense peculiar to the named plaintiff or a small subset of the plaintiff class may destroy the required typicality of the class." *CE Design Ltd. v. King Architectural Metals, Inc.*, 637 F.3d 721, 726 (7th Cir. 2011).

Roman argues that his claims are typical of the class because as a company driver for Triton, he shared the same job duties as other putative class members, and was subject to the same policies, procedures, and compensation scheme. [29] at 9. According to him, any member of the putative class would be typical in this case because of Triton's "formulaic behavior." *Id.* (citing *Costello v. BeavEx Inc.*, 303 F.R.D. 295, 306 (N.D. Ill. 2014) (named plaintiffs' claims were typical of class of delivery drivers classified as independent contractors), *aff'd in part, vacated in part, remanded*, 810 F.3d 1045 (7th Cir. 2016) (finding predominance established as well)).

Triton argues that Roman's claims are atypical in two ways: (1) Roman does not identify any instance of him requesting reimbursement and Triton failing to do so; and (2) Triton paid Roman's wages to a business, not personal, account. [38] at 16–19. As discussed above, Roman's claims do not rely on a failure to reimburse requested expenses, but on Triton's practice and policy to deduct wages for expenses that inured to Triton's benefit. Roman and other drivers were subject to the same

16

practices and policies. *See* [30-2] (Driver's Compensation Policy); [29-8] (Rules of Conduct for All Drivers); [29-9] (General Policies). Triton's policies did not allow drivers to seek reimbursement of the escrow withholding or insurance deduction. *See* [30-2] at 1. Roman's claims based on these uniform withholding and deductions are the same as other drivers.

Triton offers no authority to support its argument that Roman's receipt of payment through an LLC has any bearing on the viability of his claims. "[D]esignations and terminology used by the parties are not controlling nor is the claimant's status for tax purposes controlling." 56 Ill. Admin. Code § 300.460(c). Nothing in the record suggests that Roman's use of his LLC to receive payment was relevant to Triton's method of compensating Roman, Triton's withholding or deduction policies, or Triton's direction and control of Roman's work as a driver. Roman contracted with Triton as an individual.[6] [38-2]. There is no evidence that Roman "invoiced" Triton—Triton issued Roman's settlement statements to him individually at his home address, not to his LLC address. [38-3] at 3; [30-3].

Roman's LLC does not interject a theory of liability unique to him. *See CE Design*, 637 F.3d at 724 (explaining typicality aims to prevent litigating absent class

---

[6] Even if Roman had contracted with Triton as a corporate entity, he would still have a cause of action under the Act. *See, e.g., Bruger v. Olero, Inc.*, No. 19 C 2277, 2023 WL 6290090, at *9 n.11 (N.D. Ill. Sept. 27, 2023) ("[W]here, as here an employer requires that a job applicant enter into a work agreement through a separate corporate entity, and not as an individual, the fact that the formal parties to the agreement are corporations cannot factor significantly into the employee-contractor analysis."); *Johnson v. Logistics*, No. 16-CV-06776, 2018 WL 1519157, at *9 (N.D. Ill. Mar. 28, 2018) ("It might be that the parties settled on an option of having such payments going through the company that Johnson owned."); *Ware v. Indus. Comm'n*, 318 Ill.App.3d 1117, 1127 (1st Dist. 2000) ("[W]e do not see how the fact of Ware's incorporation significantly alters the analysis here.").

member claims based on a representative's claim that would fail or prevail on unique grounds). Indeed, other class members were apparently paid through corporate accounts. *See* [29-4] at 102:13–104:1 (Roman used his LLC on the recommendation of other drivers). Roman's claims are typical of the proposed class.

### D. Adequacy

Both the representative plaintiff and their class counsel must "fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). This requirement "serves to uncover conflicts of interest between named parties and the class," as well as divergent interests among class members. *Howard*, 989 F.3d at 609–10.

While Triton does not contest class counsel's adequacy, [38] at 8 n.1, I must still ensure that Rule 23(a)'s requirements are met to "protect[ ] absent class members whose rights may be affected by the class certification." *Davis v. Hutchins*, 321 F.3d 641, 649 (7th Cir. 2003). To determine whether class counsel is adequate, I consider the work they've done in identifying or investigating potential claims in the case; their experience in handling class actions, other complex litigation, and the types of claims asserted in the case; their knowledge of the applicable law; the resources they'll commit to representing the class; and anything else that's relevant to their ability to fairly and adequately represent the class. Fed. R. Civ. P. 23(g)(1)(A)–(B). Roman's counsel are experienced class action litigators with experience in wage and hour, misclassification, and driver cases. [29-12] ¶¶ 5–7; [29-13] ¶¶ 4–9; [29-14] ¶¶ 4–10. They have committed resources to this case, bringing it and litigating the case

through discovery. *See* [1]; [29-4]; [29-5]. Proposed class counsel is adequate to represent the putative class.

A class representative cannot have "antagonistic or conflicting" interests to the class as a whole and cannot present severe credibility problems. *See Rosario v. Livaditis*, 963 F.2d 1013, 1018 (7th Cir. 1992) (antagonistic or conflicting interests); *CE Design*, 637 F.3d at 726 (credibility problems). Adequacy of the class representative often merges with typicality. *See Santiago v. City of Chicago*, 19 F.4th 1010, 1018 (7th Cir. 2021) ("To be an adequate representative, a named plaintiff must be a member of the putative class and have the same interest and injury as other members."); *CE Design*, 637 F.3d at 724; *Robinson v. Sheriff of Cook Cnty.*, 167 F.3d 1155, 1157 (1999) ("[I]f [plaintiff's] claim is atypical, he is not likely to be an adequate representative."). Triton's adequacy arguments that repeat its typicality challenges (that Roman may uniquely win or lose because he did not request reimbursements, was paid through an LLC, and agreed to the withholding and deductions) are unpersuasive for the same reasons they did not persuade on the typicality question.

Triton argues that Roman is inadequate because "he does not have a threshold understanding of the issues in this litigation, he has no knowledge pertaining to any other class members, and he was never directly compensated by Defendants."[7] [38]

---

[7] Triton also questions Roman's credibility by citing to his work experience—14 jobs in a five-year period including a dozen trucking companies. [38] at 8. They do not explain how this would make him incredible. "For an assault on the class representative's credibility to succeed, the party mounting the assault must demonstrate that there exists admissible evidence so severely undermining plaintiff's credibility that a fact finder might reasonably focus on plaintiff's credibility, to the detriment of absent class members' claims." *CE Design*, 637 F.3d at 728. Triton has not carried this burden.

at 7. To support these assertions, Triton points to snippets of Roman's deposition testimony. [38] at 8–9. Triton says that Roman's testimony reveals he had little knowledge of other drivers, how other drivers were classified and whether they were owed wages, and did not attempt to contact any former coworkers about the lawsuit. [38] at 8–9 (citing [29-4] at 14:8–22, 15:10–18, 144: 14–25, 145:1–10, 146:9–11, 148: 18–22). Triton argues that Roman's lack of knowledge regarding other class members and failure to contact any former employees "demonstrat[es] his apathy towards representing the class." [38] at 8.

Looking at Roman's testimony in context paints a different picture. Roman testified that he believed everyone was a company driver, observed other drivers when he was in the yard to the extent he had the opportunity, and that he tried to warn other drivers of Triton's alleged abuses. *See* [29-4] at 34:3–36:7, 88:11–89:2, 123:4–16, 205:6–208:12; 215:16–24. He has been active in this litigation, seeking out class counsel, responding to written requests, producing documents, and attending an in-person deposition. *See* [29-4]; [29-5]; [29] at 9–10. The evidence does not support Triton's argument that Roman is "solely concerned with his individual claims." *See* [38] at 9.

Triton attacks Roman's understanding of his claims as well, again excerpting Roman's testimony. Triton argues that Roman's understanding of his misclassification argument is that he was considered an independent contractor so Triton "d[id]n't have to go through legal proceedings." [38] at 9 (citing [29-4] at 144:14–25). Triton also states that Roman's testimony reveals that he never intended

to be an employee of Triton. [38] at 9. In context though, Roman responded to the question, "Do you believe the company considered you to be an independent contractor?" with "I believe they were trying to say that I was so they don't have to go through legal proceedings." [29-4] at 144:14–19. Roman also demonstrated that he understood the distinction between a company driver position and a lease purchase arrangement. [29-4] at 34:8–36:7; 88:11–89:2. He believed "company drivers should not be paying fuel, tolls, chargeable repairs, cash advances, and then company deductions." [29-4] at 88:12–16. Ultimately, Roman's failure to describe his claims with the sophistication of his attorneys does not render him inadequate. *See Surowitz v. Hilton Hotels Corp.*, 383 U.S. 363, 372–74 (1966) (holding that a client doesn't need to know the ins and outs of the lawsuit); *Eagle v. Vee Pak, Inc.*, 343 F.R.D. 552, 577 (N.D. Ill. 2023) ("Courts have emphasized that the bar for class representatives' knowledge about the litigation subject is modest.") (collecting cases); *Rand v. Monsanto Co.*, 926 F.2d 596, 598–99 (7th Cir. 1991), *overruled on other grounds by Chapman v. First Index, Inc.*, 796 F.3d 783 (7th Cir. 2015) ("[A] representative plaintiff need not immerse himself in the case[,] . . .[but] must have some commitment to the case, so that the 'representative' in a class action is not a fictive concept."). Roman has satisfied Rule 23(a)'s adequacy requirement.

### E. Superiority

Class treatment must also be "superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). Class actions are generally superior when "small recoveries [would] not provide the incentive for any individual to bring a solo action prosecuting his or her rights," *see Mullins*, 795

F.3d at 658, or when collective treatment "would achieve economies of time, effort, and expense, and promote . . . uniformity of decision as to persons similarly situated," *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 615 (1997).

The record is unclear on the amount drivers stand to recover. There may be a large range of potential recovery considering drivers worked for Triton for different lengths of time. If the costs of pursuing an individual case would exceed driver's potential recovery, a class action would be superior. *See Carnegie v. Household Int'l Inc.*, 376 F.3d 656, 661 (7th Cir. 2004) ("The *realistic* alternative to a class action is not 17 million individual suits, but zero individual suits, as only a lunatic or a fanatic sues for $30. But a class action has to be unwieldy indeed before it can be pronounced an inferior alternative . . . to no litigation at all.").

Even if drivers' claims are large enough to be worth pursuing individually, the commonality of the claims is a reason to find a class action superior. *See Messner*, 669 F.3d at 814 n.5 ("[T]he more common issues predominate over individual issues, the more desirable a class action lawsuit will be as a vehicle for adjudicating the plaintiffs' claims."). If all 535 putative class members brought individual claims, the same claims and facts would be adjudicated by multiple courts, expending unnecessary time and effort and creating the risk of different outcomes. *See Suchanek v. Sturm Foods, Inc.*, 764 F.3d 750, 759 (7th Cir. 2014). Resolving this case as a class action is superior to resolving it via alternative methods.

## III.    Conclusion

Plaintiff's motion for class certification, [29], is granted. The following class is certified: All persons who have performed work in Illinois for Triton as company

drivers while being classified as independent contractors from October 19, 2013, to April 16, 2025. Carlos Roman, Fair Work, P.C., and Stephan Zouras, LLC are appointed representatives of the class.

ENTER:

Manish S. Shah
United States District Judge

Date: April 16, 2025